IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| REBECCA JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 15-cv-672-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Rebecca Jackson seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for benefits in August 2009, alleging disability beginning on September 10, 1999. Her application for benefits was denied in February 2012. (Tr. 11-19). After the Appeals Council denied review, plaintiff sought judicial review. See, Rebecca Jackson v. Commissioner of Social Security, Case No. 13-cv-279-CJP. This Court ordered the case remanded to the agency for further proceedings pursuant to sentence four of 42 U.S.C. §405(g). (Tr. 1284-1313).

On remand, the case was again assigned to ALJ Robert G. O'Blennis. Additional medical records were submitted, and ALJ O'Blennis held another

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 7.

evidentiary hearing. He then denied the application on May 26, 2015. (Tr. 1232-1242). That decision stands as the final agency decision. 20 C.F.R. §416.1484(d).

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

In her brief, plaintiff amended her alleged date of onset to January 4, 2001. Because she was insured for DIB only through September 30, 2002, the period at issue is from January 4, 2001, through September 30, 2002.   See, Doc. 12, p. 3.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in weighing the opinion of treating physician Heidi Prather, D.O.

2. The ALJ did not properly assess the credibility of plaintiff or of the third-party witnesses.

3. The ALJ improperly assessed plaintiff's complaints of pain, which undermined the RFC assessment.

### Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from

2

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work

experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). See also *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Jackson was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant

4

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).  In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ O'Blennis followed the five-step analytical framework described above.  He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and that she was insured for DIB through September 30, 2002.

The ALJ found that plaintiff had one severe impairment, degenerative disc disease, and that this impairment did not meet or equal a listed impairment.

The ALJ found that Ms. Jackson had the residual functional capacity (RFC) to perform light work, limited to no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching, and crawling; and no exposure to vibrations, extreme temperatures, walking on unimproved terrain, or environmental irritants.  She was also limited to simple and/or repetitive work that did not require close interaction with the public.

Ms. Jackson had no past relevant work.  Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was

able to do jobs that exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.   Agency Forms

Rebecca Jackson was born in July 1967, and was 33 years old on the amended alleged disability onset date of January 4, 2001. (Tr. 74). She was insured for DIB through September 30, 2002. (Id.). Ms. Jackson claimed she was disabled due to a number of conditions, including back pain, degenerative disc disorder, asthma, and migraines (Tr. 352). She indicated that she filed for disability primarily because of her back pain (Tr. 368).

Ms. Jackson had no earnings in 1997, 1998, 1999, or 2000. She was self-employed from 2001 to 2003, but she earned less than $2,500.00 each year. (Tr. 1438-1439).

### 2.   Evidentiary Hearings

The Court summarized the evidence presented at the two evidentiary hearings held before remand in the Memorandum and Order remanding plaintiff's first case.  See, Tr. 1289-1293.

Ms. Jackson was represented by an attorney at the evidentiary hearing held after remand on April 23, 2015.  (Tr. 2459).

Plaintiff lived with her husband and three children, aged 20, 18 and 15.  She

has a bachelor's degree in business administration. (Tr. 2463-2464).

Plaintiff testified that she had a number of medical problems, some of which postdated September 30, 2002. During the period at issue, she was treated for back pain with epidural injections and medications, including hydrocodone and lidocaine patches. She might also have been taking Neurontin. She did not do physical therapy because she had an ovarian cyst and ultimately had to have a hysterectomy. (Tr. 2464-2469).

During the period in issue, plaintiff's mother was at plaintiff's house "all the time" because plaintiff needed help taking care of her daughters. (Tr. 2471).

From 2001 through 2003, plaintiff earned some money setting up displays of neckties in stores. She was an independent contractor for the manufacturer. She worked part-time. (Tr. 2475-2476).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, described above. The VE testified that this person would be able to do several unskilled jobs at the light exertional level: inspector or tester, office clerk, and hand packager. (Tr. 2483-2485). There would also be unskilled jobs at the sedentary level that she could do, such as office helper, assembler, and hand bagger. (Tr. 2486).

### 3. Medical Records

There are voluminous medical records in the transcript, but most of them postdate the period in issue.

In October 2000, plaintiff began seeing primary care physician Margaret Reiker. She complained of mood swings and migraine headaches. She was noted

7

to be a homemaker.  Dr. Reiker prescribed Zoloft.  (Tr. 442-443).

On January 4, 2001, the amended alleged date of onset, Ms. Jackson saw Dr. Heidi Prather for the first time.  Dr. Prather practiced at the school of medicine at Washington University in St. Louis, Missouri.  She specializes in physical medicine and rehabilitation.  Plaintiff complained of low back pain and right lower extremity pain.  She told Dr. Prather that she had back pain with all three of her pregnancies, but it usually improved after she gave birth.  However, her pain had persisted after her baby was born about 16 months earlier.  Also, she had felt something pull in her back while she was moving a seat the prior October.  On exam, she was able to do lumbar flexion, extension, side bending and rotation, but had pain at the end of flexion.  Sensory exam was intact to light touch.  She had positive slump-sit increasing with peroneal bias on the right.  The diagnosis was intermittent right L5 radicular pain.  Dr. Prather ordered an MRI and prescribed Darvocet as needed for pain.  (Tr. 2451-2452).

An MRI of the lumbar spine performed the next day showed degenerative disk disease at L5-S1 with lateralization of a disc protrusion to the left within the canal extending into the foramen on the left with mild effacement of the descending left S1 nerve root and of the exiting left L5 nerve root; and bulging disc at L4-5 extending into the inferior foramen on the left, which was diffuse and relatively mild.  (Tr. 655).

Dr. Prather administered an epidural steroid injection on January 17, 2001. (Tr. 2450).  When plaintiff returned on February 12, 2001, she reported that she had only about 4 days of pain relief from the shot.  On exam, she had pain with

8

forward flexion and pain with slump-sit with tibial bias. She was still having lower extremity pain and was having difficulty sleeping. Dr. Prather's diagnosis was right L5 radiculopathy with known history of a herniated disc at L5-S1. She refilled the prescription for Ultram, prescribed Doxepin for sleep, and planned a repeat injection. (Tr. 2449).

Dr. Prather administered a second epidural steroid injection on February 16, 2001, and a third injection on April 11, 2001. (Tr. 2442, 2445).

Ms. Jackson was seen by Dr. Daniel Riew on June 14, 2001. He also practiced at the school of medicine at Washington University, She complained of axial back pain for about 6 years. She occasionally got radiation into both lower extremities, but most of the time it did not radiate. She had normal sensory exam, normal motor reflexes, and negative straight leg raising. Dr. Riew said that the MRI showed a desiccated disc at L5-S1 with minimal protrusion on the left side without significant neural impingement. His impression was degenerative joint disease causing axial back pain. Dr. Riew did not recommend surgery. He recommended aerobic exercise, especially swimming, and postural modifications. (Tr. 2440).

Ms. Jackson returned to Dr. Prather on November 1, 2001. She had increasing pain, worse on the left. On exam, she had positive slump-sit with increasing tibial bias and chin tuck bilaterally. Range of motion was restricted in rotation, and she had "extremely poor control of abdominal muscles." The diagnosis was S1 radicular pain in a setting of bilateral degenerative disc changes at L5-S1. (Tr. 2438).

Dr. Prather administered an epidural steroid injection on November 7, 2001. (Tr. 2434). Plaintiff returned for two more injections in August 2002. (Tr. 2426, 2430).

Dr. Prather ordered a repeat lumbosacral MRI, which was done on August 16, 2002. This study showed disc degeneration at L5-S1 with asymmetric disc bulging resulting in impingement upon and slight posterior displacement of the left S1 nerve root/sheath; and left posterolateral concentric annular tear at L5-S1. (Tr. 1067-1068).

Ms. Jackson was last insured for DIB on September 30, 2002.

On December 30, 2002, Ms. Jackson underwent a lumbosacral myelography. This study showed a small central and left-sided disc protrusion at L5-S1 causing minimal impingement on the left S1 nerve root. (Tr. 1179-1183).

Plaintiff did not return to Dr. Prather until November 2003. At that time, Dr. Prather noted that she had had a myelogram. The doctor stated that plaintiff had a degenerative disc bulge with no encroachment along the nerve root. On exam, she again had positive slump-sit, worse with peroneal bias and chin tuck on the right. The impression was L5-S1 radicular pain in the setting of degenerative disc changes at L5-S1. Dr. Prather recommended another injection. (Tr. 2424).

    **4. Dr. Prather's Opinion**

Dr. Prather expressed her opinion as to plaintiff's limitations in a letter dated October 18, 2011. She said that, in 2001, plaintiff was "unable to do regular activities of daily living." She was unable to sit or stand for more than 30 minutes at a time, and was unable to lift, carry, push or pull more than 20 pounds. Dr.

10

Prather said that her opinion that these limitations continued throughout the years since the initial visit was "purely based on the patient's report of her ability to do activities." (Tr. 1227-1228).

### 5. State Agency Consultants' RFC Assessment

There is no state agency consultant RFC assessment in the transcript.

## Analysis

Plaintiff first argues that the ALJ erred in weighing Dr. Prather's opinion.

The ALJ gave Dr. Prather's opinion "little weight" because the objective medical evidence did not support it, she only began treating plaintiff in 2001, she stated that her opinion was based on plaintiff's own reports, her letter was written in 2011, and her knowledge of the progression of plaintiff's condition may have colored her perception of plaintiff's limitations before September 30, 2002. (Tr. 1239-1240).

Dr. Prather is a treating doctor. The ALJ is required to consider a number of factors in weighing a treating doctor's opinion. The applicable regulation refers to a treating healthcare provider as a "treating source." 20 C.F.R. §404.1527(c)(2) governs the weighing of treating source opinions:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling

11

>weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

Obviously, the opinions of treating doctors are not necessarily entitled to controlling weight. Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

It is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(c)(3). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527.

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

12

In the order remanding Ms. Jackson's first case, the Court pointed out that the version of Dr. Prather's records in the transcript at that time was incomplete. See, Tr. 1305-1306. The Court also found that the ALJ failed to mention evidence which supported plaintiff's claims, including the results of Dr. Prather's exams. See, Tr. 1307.

A complete version of Dr. Prather's records was submitted after remand and designated as Ex. 61F. (Tr. 2205-2458). The ALJ failed to refer to this exhibit at all. In fact, his discussion of Dr. Prather's treatment is identical in both decisions. Compare Tr. 13-14 to Tr. 1237-1238.

The ALJ apparently failed to review the second version of Dr. Prather's office notes. He relied on his earlier review of the incomplete version, Ex. 12F. This led him to, again, erroneously state that plaintiff "apparently did well" after February 2001 because she did not return to Dr. Prather until November 2001. (Tr. 1237). In fact, plaintiff saw Dr. Prather in April 2011. And, the ALJ was apparently unaware that plaintiff saw Dr. Prather twice in November 2001 and twice in August 2002. See, Tr. (Tr. 2426, 2430, 2434, 2438).

The Commissioner argues that the ALJ's failure to review all of Dr. Prather's records is harmless because the overlooked records only show that plaintiff received three more steroid injections. Doc. 15, p. 7. The Court disagrees. The overlooked visits undermine the ALJ's conclusion that Dr. Prather did not have an extensive treatment relationship with Ms. Jackson during the period in issue and also his conclusion that her back pain was not as bad as she claimed because she supposedly did not return to Dr. Prather between February and November.

13

Further, Dr. Prather's complete records contain pain questionnaires completed by Ms. Jackson. See, for example, Tr. 2446-2448. Further, the fact that Dr. Prather had questionnaires completed by Ms. Jackson back in 2001 and 2002 is relevant to whether her 2011 opinion was overly influenced by her knowledge of the progression of plaintiff's condition.

In addition, the ALJ again failed to discuss Dr. Prather's *findings* on physical exams. It is difficult to see how the ALJ could reliably conclude that Dr. Prather's opinion was not supported by the objective medical evidence when the ALJ did not meaningfully consider the whole of the objective medical evidence. And, the ALJ again incorrectly characterized the MRI findings, as the Commissioner concedes. See, Doc. 15, pp. 7-8.

In view of the ALJ's selective review of the medical records, the Court finds that the ALJ failed to build the required "logical bridge" from the evidence to his conclusions about the weight to be afforded to Dr. Prather's opinion. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2010), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

In view of the disposition of plaintiff's first point, it is not necessary to analyze plaintiff's other arguments in detail. The failure to review Dr. Prather's complete records also affected the assessment of plaintiff's credibility. The ALJ based his assessment, at least in part, on his perception that her allegations were "inconsistent with the preponderance of the evidence of record as a whole." Tr.

14

1240-1241. However, it is apparent that the ALJ did not review the evidence in its entirety. Further, the pain questionnaires completed by Ms. Jackson in 2001 and 2002 are certainly relevant to the credibility of her later allegations.

For these reasons, the ALJ's credibility analysis is suspect, and should be reconsidered in light of a review of all of the medical evidence on remand.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Jackson was disabled during the relevant time period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Rebecca Jackson's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** June 10, 2016.

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**